Marc L. Mukasey (*Pro Hac Vice*)
Torrey K. Young (*Pro Hac Vice*)
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, NY 10018
Telephone: (212) 218-5500
Facsimile: (212) 218-5526
E-Mail: MMukasey@seyfarth.com;
TKYoung@seyfarth.com

Brian R. Michael (CA SBN 240560)
MORRISON FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017
Telephone: (213) 892-5200
Facsimile: (213) 892-5454
E-Mail: BMichael@mofo.com

Attorneys for JOSEPH NEAL SANBERG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:25-CR-00200(a)-SVW |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| vs. | |
| JOSEPH NEAL SANBERG, | Hearing Date: April 27, 2026<br>Hearing Time: 11:00 a.m.<br>Location: Courtroom of the Hon. Stephen V. Wilson |
| Defendant. | |

JOSEPH NEAL SANBERG, through Counsel, hereby files his Sentencing Memorandum.  For the reasons set forth below, Mr. Sanberg respectfully submits that a profound downward variance, of unusual and special length, is required to do justice in this case and would result in a sentence that would be sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Dated: April 19, 2026                    Respectfully submitted,


 /s/ Marc L. Mukasey
MARC L. MUKASEY
TORREY K. YOUNG
Seyfarth Shaw LLP
620 8th Avenue, 32nd Floor
New York, NY 10018

and

 /s/ Brian R. Michael
BRIAN R. MICHAEL
Morrison Foerster LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017

Attorneys for Defendant
JOSEPH NEAL SANBERG

2

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

I.  PERSONAL HISTORY AND CHARACTERISTICS, 18 U.S.C. § 3553(A)(1) ..................................................................................................... 2

    A.  Joe's Early Life ................................................................................... 2

    B.  Anti-Poverty Work ............................................................................. 3

    C.  Aspiration ........................................................................................... 7

II.  NATURE AND CIRCUMSTANCES OF THE OFFENSE, 18 U.S.C. § 3553(A)(1) ..................................................................................................... 8

    A.  AlHusseini's Guilty Plea ................................................................... 8

    B.  Sanberg's Guilty Plea ........................................................................ 9

III.  THE OFFENSE LEVEL OVERSTATES JOE'S CULPABILITY AND ECONOMIC REALITY, 18 U.S.C. § 3553(A)(1) ...................................... 12

    A.  Revised Loss Numbers ..................................................................... 13

    B.  Collateral .......................................................................................... 14

IV.  OTHER MITIGATING FACTORS ...................................................................... 19

    A.  Joe's Acceptance Of Responsibility Was Early And Extraordinary ........... 19

    B.  The Government Gave Lenient Treatment To A More Culpable Participant ................................................................................................. 20

    C.  Joe Is Not Responsible For Aspiration's Bankruptcy Or For Every Investor's Loss ........................................................................................ 21

    D.  The Government's Characterization Of This Matter As "Ponzi-like" Is False .......................................................................................................... 22

    E.  Joe's Mother Needs His Care ........................................................... 24

V.  THE PSR CORRECTLY APPLIES THE ZERO-POINT OFFENDER ADJUSTMENT .................................................................................................. 24

VI.  JOE DESERVES A GREATER DOWNWARD VARIANCE THAN SIMILARLY SITUATED DEFENDANTS, 18 U.S.C. §§ 3553(A)(1), 3553(A)(6) .......................................................................................................... 26

VII.  INCARCERATION IS UNNECESSARY TO ACHIEVE SPECIFIC OR GENERAL DETERRENCE, 18 U.S.C. § 3553(A)(2)(B) ................................. 29

CONCLUSION ................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re: CTN Holdings, Inc.*,
Case No. 25-10603-TMH (Bankr. D. Del. 2025) ........................................................ 17

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................................................... 3, 18

*United States v. Allmendinger*,
706 F.3d 330 (4th Cir. 2013) ................................................................................ 15

*United States v. AlHusseini,*
Case No. 25 Cr. 42 (SVW) (C.D. Cal. 2025) .............................................................. 21

*United States v. Anderson*,
533 F.3d 623 (8th Cir. 2008) ................................................................................ 28

*United States v. Bankman-Fried,*
Case No. 22 Cr. 673 (LAK) (S.D.N.Y. 2022) ............................................................ 18

*United States v. Blarek,*
7 F.Supp.2d 192 (E.D.N.Y. 1998) ........................................................................ 30

*United States v. Cole*,
Case No. 19 Cr. 869 (ER) (S.D.N.Y. 2019) ............................................................... 27

*United States v. Gentile*,
Case No. 21 Cr. 54 (RPK) (E.D.N.Y. 2021) ............................................................... 23

*United States v. George*,
949 F.3d 1181 (9th Cir. 2020)............................................................................... 24

*United States v. Heine*,
2018 WL 2986212 (D. Or. June 14, 2018),
*convictions vacated by United States v. Yates*, 16 F.4th 256 (9th Cir. 2021) ............. 27

*United States v. Hutchison*,
22 F.3d 846 (9th Cir. 1993),
*abrogated on other grounds, United States v. Well*s, 519 U.S. 482 (1997) ................. 14

DEFENDANT'S SENTENCING MEMORANDUM

*United States v. Johnson*,
    2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......................................................... 18, 29

*United States v. Malik*,
    424 F. App'x 122 (3d Cir. 2011) ................................................................................ 28

*United States v. Marcks*,
    2025 WL 1506360 (D. Nev. May 26, 2025) ................................................................ 23

*United States v. Matthews*,
    Case No. 18 Cr. 48 (VAB) (D. Conn. 2018) .............................................................. 27

*United States v. Mohamud*,
    2021 WL 4460705 (S.D. Cal. Sept. 29, 2021) .............................................................. 6

*United States v. Munoz-Nava*,
    524 F.3d 1137 (10th Cir. 2008) ................................................................................. 23

*United States v. Musgrave*,
    647 F. App'x 529 (6th Cir. 2016) ........................................................................ 11, 29

*United States v. Nadimpalli*,
    Case No. 24 Cr. 21 (CRB) (N.D. Cal. 2024) ..................................................... 26, 27, 29

*United States v. Redemann*,
    295 F. Supp. 2d 887 (E.D. Wis. 2003) ....................................................................... 15

*United States v. Saeteurn*,
    504 F.3d 1175 (9th Cir. 2007) ................................................................................... 25

*United States v. Sponaugle*,
    2022 WL 4079197 (D. Del. Sept. 6, 2022) ................................................................. 28

*United States v. Thompson*,
    130 F.4th 1158 (9th Cir. 2025) ................................................................................. 14

*United States v. Wiederhorn*,
    Case No. 24 Cr. 295 (RGK) (C.D. Cal. 2024) ............................................................ 28

*United States v. Williams*,
    292 F.3d 681 (10th Cir. 2002) ................................................................................... 14

DEFENDANT'S SENTENCING MEMORANDUM

**State Cases**

*Clover Private Credit Opportunities Origination (Levered) II LP v. AlHusseini*,
Index No. 653401/2023 (N.Y. Sup. Ct., N.Y. Cnty. 2023) ...........................................20

*Clover Private Credit Opportunities Origination (Levered) II, L.P., et al. v. Joseph Sanberg, et al.*,
227 A.D.3d 540 (N.Y. App. Div. 1st Dep't 2024) .......................................................19

**Federal Statutes**

18 U.S.C. § 3553(a) ...............................................................................................*passim*

**Rules**

Fed. R. Crim. Proc. 32(f) ...........................................................................................24

iv

## **PRELIMINARY STATEMENT**

The government's sentencing brief distorts reality to spin an exaggerated and embellished tale about Joe Sanberg. It portrays him as a greedy Ponzi schemer who fleeced victims and lined his own pockets while singularly causing a corporate bankruptcy. It attributes nothing but devious motives to Joe, seeks to lay blame where it is unwarranted and untrue, and makes absurdly apocalyptic prophecies of recidivism. At the same time, the government ignores crucial details of the case and is opaque as to others. It is no surprise that the government's storyline flies in the face of the record, lacks factual accuracy, and ignores mitigating facts. That has been their modus operandi throughout this matter. The government could scarcely explain their own case to the Court at the plea hearings, yet their zeal to vilify Joe with obfuscations, distortions and half-stories knows no bounds.

The government snubs many powerful voices that attest how Joe Sanberg's life has been defined by a "deep and consistent commitment to improve the lives of others, especially the less fortunate and those living in poverty." (Ex. A-1). "He [has] used his considerable talents to advocate against poverty and to help families in California find a better pathway to the American Dream." (Ex. A-2). Joe has helped lift up "millions of low-income individuals and families" with his relentless work for the underprivileged, his successful drive to get anti-poverty legislation passed, and his hands-on work educating under-served communities. (Ex. A-3). When it comes to fighting poverty in the trenches, Joe Sanberg has been a "hero." (Ex. A-4).

Joe's focus has always been on purpose over personal gain. His conduct in this case was not driven by greed, and he derived little financial gain from it. Today, he is penniless and lives in his mother's house, his career and reputation in tatters.

Joe will appear at sentencing as a man who is broken but not ashamed to say he should have done things differently, and who is wiser today than he was yesterday. He has humility enough to retrace his steps and reevaluate his decisions. The lessons he has

learned from this case, and the remorse he feels, are real.  He seeks only the chance to continue working to pay restitution, to care for his mother, and to serve the impoverished.

We respectfully submit that a profound downward variance, of unusual and special length, is required to do justice in this case and would result in a sentence that would be sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  This is an extraordinary request, but it is based, among other reasons set forth herein, on:

- Joe's unprecedented public service contributions;
- the offense level's gross overstatement of the seriousness of the conduct;
- Joe's position at the low end of the culpability scale;
- Joe's early and extraordinary acceptance of responsibility;
- the lenient treatment given to a more culpable participant;
- the substantial downward variances given to similarly situated defendants nationwide;
- Joe's desire to work to pay restitution;
- the need to care for his mother; and
- the hyperbole, inaccuracy and overstatement in this prosecution that have already caused him irreparable harm.

An additional fact that justifies a profound downward variance: Joe Sanberg "still has a great deal to offer society."  (Ex. A-5).  A profound variance – and not the outrageously harsh sentence sought by the government – will allow him to do so.

I. **PERSONAL HISTORY AND CHARACTERISTICS, 18 U.S.C. § 3553(A)(1)**

A. **Joe's Early Life**

Joe Sanberg's childhood was traumatic.  He grew up with a ▮▮▮▮▮▮, volatile and often estranged father.  PSR ¶ 99.  Joe informs that his father suffered from ▮▮▮▮▮ and that Joe lived in fear of his physically and emotionally abusive father as a child.  *Id.* ¶¶ 99, 102.  He has had no contact with his dad for nearly 30 years.  *Id.* ¶ 99.

Joe's mother raised him as a single parent in very challenging circumstances.  The family home was foreclosed upon at the end of Joe's high school years, which forced

2

them to move into his grandparents' residence. *Id.* ¶ 105. Notwithstanding these difficult times, Joe's mother instilled all the right values in him. Dr. Wayne Sandler, who has spent countless hours with Joe, puts the lie to the government's depiction of Joe as a "serial fraudster." ECF 76 at 1. Dr. Sandler attests that Joe possesses a "fundamentally good moral character." (Ex. A-6). There is "a deeper moral framework that guides his thinking and conduct" and "a genuine desire to act in accordance with ethical principles." *Id.* Joe's decision to plead guilty in this case early in the proceedings is consistent with Dr. Sandler's observation that Joe is driven by "empathy, remorse . . . and a willingness to take responsibility for his behavior." *Id.*

As a young man, Joe's priority was taking care of his mom. According to family friend Laurene Farrow, "[i]n high school and college Joe was passionate about pursuing a career in public service, motivated by a desire to serve others in need. But when college graduation approached, Joe initially chose to take a job in the private sector rather than pursue public service. He made this choice in order to guarantee a higher income so that he could support his mom, who was in dire financial condition at the time." (Ex. A-5).

Joe remains extremely close with his mother, who is now 80. They live together in her house and he is critical to her daily care and well-being. *See* PSR ¶ 100; Ex. A-7.

If there is a silver lining to Joe's early life, it's that his personal experiences shaped his desire to build institutions that could provide stability, fairness, and opportunity for others, particularly families.

## B.    Anti-Poverty Work

"If ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). No quote has ever applied to a defendant more aptly than this applies to Joe Sanberg.

After college, Joe went to work as a Wall Street analyst, where he conducted himself with "integrity and professionalism." (Ex. A-8). But Joe found very little that

3

was redeeming about Wall Street.  He disliked working in an industry that totally divorced service from profit.  Since then, Joe's life has been aimed at alleviating poverty and improving economic opportunity for others.  His accomplishments and contributions championing the underprivileged have been nothing short of remarkable.

Joe's goal was to have the widest possible reach in helping lift Californians out of poverty.  In or about 2013, he formed and led two of the most significant anti-poverty efforts ever undertaken in California.  Joe performed tireless work over several years initiating and leading the legislative effort to adopt a California state Earned Income Tax Credit ("EITC").  These state-funded tax credits deliver cash directly to low-income families and are an essential part of California's anti-poverty portfolio.

Joe also founded Golden State Opportunity as a 501(c)(3) public charity with the goal of advocating for the establishment and then expansion of the EITC.  PSR ¶ 127. "Joe conceived Golden State Opportunity to make sure hundreds of thousands – even millions – of lower-income Californians had both the awareness and had help doing the paperwork needed to receive both the California EITC and Federal EITC.  This can make the difference for so many families between whether or not they live in poverty."  (Ex. A-4).

California's Department of Community Services and Development describes the EITC as "one of the nation's most powerful resources for lifting people of poverty" and its website directs visitors to Golden State Opportunity for more information.  *See* California Earned Income Tax Credit, https://www.csd.ca.gov/Pages/CalEITC.aspx. When the EITC was enacted in 2015, Governor Jerry Brown's top advisor credited Joe as "the spark" behind the EITC campaign in California.  Politico, *Politico California Playbook* (Dec. 3, 2015), https://www.politico.com/tipsheets/california-playbook/2015/12/politico-california-playbook-presented-by-chevron-horror-in-san-bernardino-nurses-for-newsom-new-ppic-poll-211572.

The impact of the EITC has been tremendous.  For those families that qualify (generally those earning less than $32,000 annually) getting the EITC is the difference

4

DEFENDANT'S SENTENCING MEMORANDUM

between their kids having three meals a day or two meals a day; between having winter clothes or being cold; between being able to schedule a doctor's appointment or skipping the appointment. That is the difference Joe Sanberg has made in the low-income community. Gene Sperling, a former White House economic advisor to two U.S. presidents, recounts being told about Joe's EITC efforts by a colleague: never before had they seen "a businessperson work so hard and be so hands on in passing state anti-poverty legislation." (Ex. A-4).

Golden State Opportunity also works to advocate and bring awareness of the EITC through a program called "CalEITC4Me" (https://www.caleitc4me.org), which Joe founded and today is one of the state's largest anti-poverty programs. CalEITC4Me spearheads a statewide effort to assist low-income workers with preparing their tax filings and ensuring their EITC eligibility. Based on the organization's website and annual reports (www.goldenstateopportunity.org/news/category/publications/), the impact has been staggering. Between 2015 and 2020, Golden State Opportunity estimates that the organization helped more than 7.5 million California households earn more than $1.9 billion in tax credits, while increasing their federal EITC by $400 million. *See* www.goldenstateopportunity.org/programs/caleitc4me/. In 2022, the organization helped pass the Foster Youth Tax Credit through state legislation, creating a new tax credit for young people who have gone through the state's foster care system. *See* https://www.gsb.stanford.edu/alumni/volunteering/act/projects/golden-state-opportunity. In 2024 alone, 3.5 million households claimed more than $1.4 billion in EITC. *See* Impact Report 2024, https://www.goldenstateopportunity.org/wp-content/uploads/2025/08/2024-Report_Golden-State-Opportunity.pdf. According to the President of Golden State Opportunity, "[t]his impact is directly tied to Joe's vision and follow-through." (Ex. A-9).

As noted by United States Congresswoman Nanette Barragán, Joe also led an effort to make sure people were paid with dignity through a minimum wage ballot initiative. (Ex. A-1). "Joe stepped up with his own money, in an effort aimed at ensuring

5

working people could earn a livable wage." (Ex. A-1). "His involvement was driven by a belief that public policy should uplift vulnerable communities and provide dignity through work." (Ex. A-1). Joe has also sponsored a high school language immersion program, (Ex. A-10), a civics program for students in the Compton School District, and he taught a budgeting and personal finance class at a homeless shelter for pregnant women in Orange.

Thomas Unterman, a former partner at Orrick and former CFO of the Times Mirror Company puts it simply: Joe Sanberg's anti-poverty efforts have had "a meaningful and lasting impact, helping millions of low-income individuals and families across the state." (Ex. A-3). And Joe did all of it humbly and modestly, behind the scenes. "[H]e never sought personal recognition or financial gain from this work." (Ex. A-9). "[N]o cameras. No reporters. No glory." (Ex. A-4). Just a "deeply dedicated, in the weeds, get-it-done, caring hero." *Id.* Ninth Circuit courts credit these kinds of community and philanthropic efforts at sentencing, even for defendants convicted of far more serious crimes than Joe. *See, e.g., United States v. Mohamud*, 2021 WL 4460705, at *5 (S.D. Cal. Sept. 29, 2021) (court considered defendant's "substantial charity, education, and spiritual work in the community" in imposing 156-month sentence after conviction for providing material support to terrorists, rejecting life sentence recommended by the government and Probation).

A final point. The government's disparagement of Joe's work in the anti-poverty arena is disturbing. In a gratuitous press release, issued *before* Joe had even pled guilty, the government mocked Joe as a "so-called" anti-poverty activist. However, the conduct to which Joe pled guilty does not in any way implicate or call into question his tireless work for impoverished families and should not diminish his real, monumental accomplishments in this area. A government press release denigrating Joe's work is indicative of an unmitigated desire to do whatever it takes to tear him down, truth be damned.

6

DEFENDANT'S SENTENCING MEMORANDUM

### C.    Aspiration

Joe's commitment to addressing income inequality and social justice led to his co-founding of Aspiration with Andrei Cherny in 2013.  Aspiration was a socially and environmentally-conscious digital bank that was purpose and values-driven: the vision was to "build a business model that aligned financial success with positive social impact."  (Ex. A-3).  Notwithstanding the government's effort to paint a distorted and misleading picture that serves their one-sided narrative, Aspiration was not a one-man show or Joe's alter ego.  Far from it.  The company was led by Cherny, who served as Aspiration's CEO, Ibrahim AlHusseini served on the board and chaired the Audit Committee, and the leadership team and board of directors were made up of individuals well-regarded as smart businesspeople.

Aspiration aimed to provide banking services and investment products alongside a "pay what is fair" pricing model that allowed customers to set their own fees.  Unlike traditional banks, Aspiration promised that customer deposits would never fund fossil fuel projects like pipelines, oil rigs and coalmines.  The company also offered access to investment funds that were fossil fuel free.  Aspiration offered savings accounts and debit cards with cash back from a select number of businesses who were "doing the right thing," plus an option to plant a tree with every purchase roundup.  According to a letter filed with the SEC in contemplation of the company's public listing, Aspiration funded the reforestation of over 45 million trees in 2021 alone.  By February 2022, the "estimated cumulative climate impact of the Aspiration community thus far [was] the equivalent of taking every car in the state of Connecticut off the road for a year."  Form S-4 Registration Statement at 230 (Feb. 15, 2022), https://www.sec.gov/Archives/edgar/data/1839610/000119312522042546/d204847ds4.htm.

Aspiration reported approximately 356,000 customer accounts at the end of 2020 and projected that number to increase to 15 million by the end of 2025.  *Id.* at 139.  By the middle of 2022, however, Aspiration shifted away from its consumer business to focus on corporate carbon credits, which are tradeable certificates that companies can

DEFENDANT'S SENTENCING MEMORANDUM

purchase to reverse their carbon footprint. The shift resulted in Aspiration selling tens of millions of tons of carbon credits to corporate customers including Microsoft, Meta, and Bank of America. In 2021, the company publicly announced revenues of $100.6 million, up 584% from the year before ($14.7 million in revenue for 2020), and projected revenue of $250 million for 2022. *See* BusinessWire (Feb. 17, 2022), https://www.businesswire.com/news/home/20220217005667/en/CORRECTING-and-REPLACING-Aspiration-Reports-Fourth-Quarter-and-Full-Year-2021-Results. Simply put, Aspiration was never a mirage or a house of cards; it was a real, bona fide, functioning company that was fulfilling its mission to meld financial success with contributing to the greater good.

Unfortunately, due to myriad complex factors, Aspiration filed for bankruptcy in March 2025. Although Joe at times served on the board, he was never an officer or even an employee of the company, and he was not privy to the day-to-day financial management of the company. Nevertheless, as a co-founder who deeply believed in Aspiration's mission, it was a heartbreaking moment for him. He had "pour[ed] his heart and soul" into the company. (Ex. A-7). "All of his time and money . . . every penny [went] into Aspiration." (Ex. A-8). This case followed.

## II.   NATURE AND CIRCUMSTANCES OF THE OFFENSE, 18 U.S.C. § 3553(A)(1)

### A.   AlHusseini's Guilty Plea

In February 2025, Aspiration board member Ibrahim AlHusseini (referred to in the Factual Basis to Joe's plea agreement as "co-schemer") agreed to plead guilty to one count of wire fraud in a related case before Your Honor. AlHusseini presented doctored bank and brokerage account statements to Swiss bank UBS in connection with a "put option" transaction. UBS is referred to in the Factual Basis as Investor Fund A, Investor Fund B, and Investment Adviser 1. AlHusseini's put option guaranteed all of one loan and approximately half of a second loan that UBS extended to Joe. The initial loan, provided in March 2020, totaled $55 million. AlHusseini was paid approximately $6 million for his $55 million guarantee from the proceeds of the loan. Joe contributed

8

DEFENDANT'S SENTENCING MEMORANDUM

approximately half of the remaining loan proceeds into Aspiration and half was used to refinance an existing loan. As set forth more fully below, Joe posted substantially all of his personal assets as collateral, including his stock in Aspiration and several other companies.

AlHusseini again submitted doctored account statements to UBS when the initial loan was refinanced in November 2021. That second loan totaled $145 million and AlHusseini was paid another $6.3 million for his put option guarantee which ultimately totaled $75 million. Joe increased his collateral package for the second loan to include stock in a publicly traded company called Blue Apron Holdings, Inc. ("Blue Apron"), which is entirely unrelated to Aspiration. After AlHusseini was arrested, he cooperated with the government and pled guilty to a single count of wire fraud. AlHusseini faces *no charges* related to Aspiration.

### B.   Sanberg's Guilty Plea

In the Fall of 2025, Joe Sanberg pled guilty to two counts of fraud. He makes no excuses for his conduct and he swiftly accepted full responsibility for his crimes. His conduct was not borne of greed, malice, or intent to harm anyone. To the contrary, Joe stepped over the line in his efforts to help Aspiration because he truly loved the company and believed deep in his soul that it could change banking practices that were unfair to ordinary families and harmful to the environment. His intentions were good; his execution, he admits, was bad.

Mr. Sanberg's misconduct, as set forth in the Factual Basis to his plea agreement, fell into three categories:

*First*, Joe pled guilty to accepting loans from a lender affiliated with UBS based, in part, on inflated bank and brokerage account statements. As noted above, however, the inflated statements did not belong to Joe; they were submitted to UBS by AlHusseini. As the government explained at Joe's guilty plea, "[t]he fraud with respect to this, Your Honor, is as to AlHusseini's inflated bank and brokerage statements not the defendant's." Oct. 20, 2025 Hearing Tr. at 25:16-18. Joe knew that false documents were presented,

9

DEFENDANT'S SENTENCING MEMORANDUM

but always believed AlHusseini had the wherewithal to cover his obligations on the loans. He nonetheless accepts complete responsibility for participating in this conduct.

Importantly, the $145 million loan was collateralized by substantially all of Joe's assets (which he lost to UBS in foreclosure), and yet only $276,000 of the loan proceeds went into Joe's bank account. *See* Exhibit B (Funds Flow Memo). On the other hand, approximately $12.3 million from UBS's two loans went into AlHusseini's bank account.

*Second*, Joe took responsibility for distributing falsified documents that overstated the value of Aspiration's "cash and equivalents" at a time when the company had a cash balance of less than $1 million. The government emphasizes the company's cash balance in its submission, yet to this day it has not identified the value of Aspiration's cash equivalents at that time. Nevertheless, a falsified letter dated June 2024 purportedly signed by Aspiration's Audit Committee, including AlHusseini, was sent to a lender named Chicago Atlantic (referred to in the Factual Basis as Investment Manager 1). Chicago Atlantic later provided Joe with a $16 million collateralized loan in January 2025. Factual Basis at ¶¶ 23-26. Joe also distributed financials that overstated Aspiration's available cash to certain potential investors in the second half of 2024—not "dozens" as suggested in the government's submission. *Id.* at ¶¶ 41-42; ECF No. 76 at 7. Joe takes full responsibility for this conduct, which he knows was wrong.

*Third*, the Factual Basis provides that certain customers who signed letters of intent ("LOIs") to purchase tree planting services from Aspiration were not bona fide purchasers, but rather paid for such services using funds they received from Joe. *Id.* ¶ 30. The Factual Basis references two wires of $350,000 each in March 2022 that originated from Joe and provides that from March 2021 through November 2022, Aspiration recognized "millions of dollars" in revenue as being from arms-length third parties rather than from a related party (Joe). *Id.* ¶¶ 31, 33, 38-39. Joe then solicited investors on the basis of financial statements that mischaracterized the company's revenue in this manner. *Id.* ¶ 40. The tree-planting services were real, but the failure to disclose Joe's related party transactions was wrong and he acknowledges that.

10

But now, in its sentencing papers, the government seeks to pile on. The government emphasizes that Joe instructed Aspiration employees not to contact the LOI customers in order to conceal his conduct, ECF No. 76 at 6, but disregards other email correspondence that shows Joe deliberately stepping away and turning over all responsibility for certain customer relationships to CEO Cherny and other executives. *See* Exhibit C. In addition, Aspiration's board of directors appointed a Special Committee on this matter, which engaged a highly regarded law firm to conduct an internal investigation into the accounting issues surrounding the LOIs. Contrary to the government's innuendo, Joe did not stand in their way.

Joe's actions in these three areas of misconduct – however misguided – were meant to *help Aspiration*, rather than to cause harm or line his own pockets. This should place him at the low end of the spectrum of culpability for fraud offenses. *See, e.g., United States v. Musgrave*, 647 F. App'x 529, 537 (6th Cir. 2016) (affirming one-day sentence for defendant with offense level of 25, noting district court's finding that the very serious nature of the offense was tempered by defendant's intentions to start a business and not to "line his own pockets with someone else's hard-earned money"). As one Aspiration investor observed: "[T]here is . . . a difference between someone who has lived a selfish, self-serving life with questionable motives and tactics and finally gets caught, and someone who has lived an upstanding and public-service oriented life but made a bad mistake out of momentary desperation . . . Joe is the latter." (Ex. A-4).

The best evidence of Joe's kind heart and good intentions is that several letters of support have been submitted to the Court by persons *who lost money* in connection with their investment in Aspiration *yet still believe a term of incarceration is unwarranted.*

- "While I am still hurt by the loss of this money, my personal experience with Joseph has never given me any reason to believe he acted with malice or ill intent… I sincerely believe he can contribute far more to society as a free man than he ever could while incarcerated."[1] (Ex. A-8).

---

[1] Notably, the author of this character letter is the same "Victim M.D." whose impact statement is the only one cited by the government in support of its argument that Joe deserves a "significant sentence." *See* ECF No. 76 at 15. But this flies in the face of the author's own sentiments.

11

DEFENDANT'S SENTENCING MEMORANDUM

- "[Joe's] failures appeared to arise from poor judgment . . . rather than from a pattern of personal excess or malice. . . . [A] sentence which preserves Mr. Sanberg's ability to engage in lawful, productive work and to make restitution over time would better serve victims and society than a sentence that forecloses that possibility." (Ex. A-11).

- "I truly hope that Joe can have the opportunity to find his way back to using his heart and talent to contribute without having to go to prison . . . [F]ew people will do as much with a second chance as Joe." (Ex. A-4).

These people know Joe Sanberg better than any lawyer or judge or probation officer ever will. They demonstrate that Joe is still respected – even after his plea – for his character, his values, and his generosity of spirit.

## III.    THE OFFENSE LEVEL OVERSTATES JOE'S CULPABILITY AND ECONOMIC REALITY, 18 U.S.C. § 3553(A)(1)

Applying the § 3553(a) factors here, it is clear that Joe's offense level of 34 vastly overstates his culpability.[2]  The same level would be assigned to the following defendants (each with a three-point reduction for acceptance of responsibility):

- Conspiracy or solicitation to commit murder involving the offer or receipt of anything of pecuniary value for undertaking the murder (U.S.S.G. § 2A1.5);

- Drug trafficking conspiracy involving 3.99 kilograms of fentanyl, defendant possessed a firearm, used violence in connection with the offense, and distributed fentanyl to an individual under the age of 18 (U.S.S.G. § 2D1.1); and

- Kidnapper who abducted a victim for more than seven days and caused permanent or life-threatening bodily injury (U.S.S.G. § 2A4.1).

Any offense level that calls for Joe to receive the same sentence as these kinds of defendants is fundamentally twisted. The § 2B1.1 loss table is the culprit. It adds a *26-level increase* for a loss between $150 million and $250 million.

---

[2] For the avoidance of doubt, nothing herein takes issue with the terms of the plea agreement, nor should be viewed as anything other than permissible argument under § 3553(a). This submission seeks only to provide additional factual background and context against which Joe's conduct and culpability should be viewed.

12

To be clear, Joe did not *pocket* $248 million, the loss number set forth in his plea agreement.  He wronged real people and real victims, but the offense level associated with that number – and the government's description of it – drastically overstates his culpability and economic reality.  That is why consideration of the § 3553(a) factors is critical here.

### A.    Revised Loss Numbers

At the time of the guilty plea hearing, the government represented that $221 million of the $248 million loss number was comprised of three institutional lenders – UBS ($145 million), Inherent Group ($60 million), and Chicago Atlantic ($16 million). What happened next is wholly absent from the government's sentencing submission.

After the guilty plea hearing and as sentencing approached, the government provided "victim impact statements" that reported loss amounts as to these three institutional lenders that were nearly $60 million *less* than the numbers that formed the basis of the loss amount in the plea agreement:

| Lender | Loss Represented by Govt. Before Plea Agreement | Loss Reflected in Post-Plea Victim Impact Statements |
|---|---|---|
| **UBS** | $145 million disclosed on July 30, 2025 | $131.5 million disclosed on February 17, 2026 |
| **Inherent Group** | $60 million disclosed on July 30, 2025 | $19 million disclosed on February 17, 2026 |
| **Chicago Atlantic** | $16 million disclosed on July 30, 2025 | $13.7 million disclosed on March 17, 2026 |
| **Total** | **$221 million** | **$164.2 million** |

The government has conceded that the newly-obtained loss numbers as to these three lenders are lower than previously thought.  The overstatement of losses as to these

DEFENDANT'S SENTENCING MEMORANDUM

three institutional lenders at the time of the guilty plea must be taken into consideration under 18 U.S.C. § 3553(a).[3]

### B. Collateral

Information about the value of the collateral pledged for these three institutional loans is also critical to evaluating Joe's culpability and the absence of malice in his conduct. A defendant who pledges collateral to secure a loan "may reduce his culpability so that the gross amount of the loan overstates the seriousness of his offense." *United States v. Hutchison*, 22 F.3d 846, 855 (9th Cir. 1993), *abrogated on other grounds, United States v. Well*s, 519 U.S. 482 (1997). "When viewed in comparison with a defendant who fraudulently obtains a loan without collateral, or a defendant who outright steals the same amount of money," a defendant who provides collateral is "less culpable because he believed the bank would recover something of value upon default." *Id.*; *see also United States v. Thompson*, 130 F.4th 1158, 1165-66 (9th Cir. 2025) (defining malice as a "desire to cause pain, injury, or distress to another"); *United States v. Williams*, 292 F.3d 681, 686 (10th Cir. 2002) ("Nevertheless, '[t]he security of [a] loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss.'") (citation omitted). The government's memorandum avoids any discussion of these critical legal principles, nor has the government provided any meaningful information or details about the collateral for these three loans.

The value of the collateral at issue here is potentially substantial and should be taken into consideration under 18 U.S.C. § 3553(a). More specifically, as to the three institutional lenders:

### UBS

The government's sentencing brief states that Joe pledged only Aspiration stock as collateral for the UBS loans. ECF No. 76 at 3, 4. That has been their constant refrain

---

[3] The government has suggested to the defense that the loss number itself would be the same regardless of the discrepancies because other "victims" could be substituted who lost money in Aspiration's bankruptcy. This argument does not change the fact that the numbers were incorrect at the time of the plea, and is also deficient for the reasons set forth in Section IV.C, *infra*.

14

throughout these proceedings. But this is yet another instance where the government is only providing a partial picture to the Court. Setting aside that UBS's independent expert – Houlihan Lokey – valued Joe's Aspiration shares at hundreds of millions of dollars both before and after UBS purchased them at its own foreclosure auction, *see* Exhibits D and E at 12, *Joe also pledged as collateral* shares in a public company called Blue Apron. Joe purchased the Blue Apron shares, then-valued at $63 million, using the proceeds of the UBS loan. Exhibit B at 5 (*see* "APRN Stock Purchase"). Yet one year later, when Joe defaulted on the UBS loan, UBS acquired the Blue Apron collateral and thereafter sold the shares in the market for only $3.3 million. That nearly 95% market drop in less than a year was due to market conditions entirely outside of Joe's control and having nothing to do with Joe's improper conduct in securing the loan, a factor that should weigh favorably in the assessment of Joe's culpability. *See, e.g., United States v. Allmendinger*, 706 F.3d 330, 343 (4th Cir. 2013) ("Nevertheless, in a case in which the actual loss caused by the defendant's fraud has other causes more proximate than the fraud, a discretionary downward departure or a variance sentence may be appropriate.") (citations omitted); *see also United States v. Redemann*, 295 F. Supp. 2d 887, 899-900 (E.D. Wis. 2003) (downward departure may be warranted where loss amount is the product of "multiple causation" scenario, such as an economic downturn or market collapse, or where defendant's gain was "minuscule compared to the total amount taken."). There is no mention of Blue Apron anywhere in the government's submission.

Joe also pledged as collateral his ownership interest in a private equity firm called PT Capital (also known as "PT Holding LLC"). Houlihan Lokey valued Joe's interest at over $38 million both before and after UBS acquired the interest at its own foreclosure auction for $1 million. Exhibits D and E at 12; Exhibit F at 23:1-25:18. Notably, since that auction, PT Capital has announced four strategic additions to its investment portfolio and appears to currently value its portfolio at more than $300 million. *See PT Capital Portfolio*, https://ptcapital.com/portfolio/; *PT Capital About Us*, https://ptcapital.com/about-us/. The relevant takeaway is this: PT Capital is a real private equity firm and the

15

collateral that Joe pledged to UBS represented substantial value. Yet to this day, the government has provided no information about whether UBS continues to own what had been Joe's interest in PT Capital or the current value of that stake. And like Blue Apron, the government does not mention the PT Capital collateral anywhere in its submission.

The offense level also does not account for the fact that UBS charged Joe 18% interest on its first loan, 15.4% interest on its second loan, and that over the life of both loans before the default, Joe appears to have repaid UBS approximately $23 million in principal and interest. Joe's repayments, like his substantial collateral, indicate he provided real value to UBS to avoid causing harm upon default. The offense level also does not account for what appears to be approximately $20 million of profit that UBS paid *itself* for the first loan. The closing memo for the second UBS loan shows that when Joe refinanced the initial $55 million loan, UBS didn't pay itself the approximately $53 million in outstanding principal. Instead, it appears to have paid itself $73.5 million. *See* Exhibit B ("Project Sian Payoff" wired to the attention of "@ubs.com" email address). Regardless of whether that $20 million is a cognizable "loss" under the Guidelines, its inclusion in determining Joe's offense level clearly overstates his culpability considering that the money was sent from UBS to UBS.

The bottom line is that Joe pledged his personal assets for a loan that he intended to benefit Aspiration. Approximately half of UBS's first loan ($55 million) was contributed into Aspiration and Joe pledged personal assets to facilitate the loan, which he then lost upon UBS's foreclosure. This does not excuse Joe's conduct, but it certainly mitigates his culpability and should be considered under § 3553(a).

**Inherent Group**

Inherent Group ("Inherent") is an investment company based in New York that provided a $60 million loan to Aspiration in early 2021, secured by the company's assets. Joe's interactions with Inherent appear to have been minimal. Joe's culpability is overstated because, again, following the plea, the parties learned that Inherent is actually claiming a $19 million loss. The government suggested that the difference could be

16

attributable to assets that Inherent purchased in Aspiration's bankruptcy proceeding. Yet we have received no information from the government about what assets Inherent purchased or how much they are worth.

Filings in the Aspiration bankruptcy proceeding suggest that Inherent acquired approximately $750 million in net operating losses ("NOLs") from Aspiration, among other assets. *See In re: CTN Holdings, Inc.*, Case No. 25-10603-TMH, ECF No. 274-1 at page 9 of 60 (Bankr. D. Del. June 3, 2025) (defining "Acquired Assets" to include "any Seller's rights to net operating losses"); *Id.*, ECF No. 96 at page 28 of 172 (Schedule of Debtor Assets identifying approximately $751,859,389 in "Tax refunds and unused net operating losses"). Those NOLs may allow Inherent to greatly reduce its tax liability. Yet the government has provided *zero* information about this crucial assessment of economic reality for Joe's sentencing.

Notably, Inherent's purchase of Aspiration's assets during the bankruptcy closed in June 2025, or more than a month before the government represented that Inherent suffered a total loss of its $60 million loan.

**Chicago Atlantic**

The story is the same for Chicago Atlantic, an alternative investment manager that provided a collateralized loan to Joe in January 2025. The government's position at the time of the plea was that Chicago Atlantic lost $16 million, yet we then received a victim impact statement from the government that claimed a loss of $13.7 million. We understand that after Joe defaulted on the loan, Chicago Atlantic took possession of his collateral, which included a stake in the climate-focused digital bank GreenFi. GreenFi is very much a real company, with real operations, and real value. *See* https://www.greenfi .com/. The government has provided no information on the value of the collateral that Joe pledged for the loan.

To be clear, the value of the collateral for these loans is, when applying § 3553(a), critical to evaluating Joe's culpability and economic reality and ensuring that the Court has the full and complete picture at the time of Joe's sentencing. We have received

DEFENDANT'S SENTENCING MEMORANDUM

nothing from the government on this potentially substantial value and the prosecutors make no mention of it anywhere in their submission.  Such glaring omissions weigh strongly in favor of a substantial downward variance.

\* \* \* \* \*

Senselessly harsh results under § 2B1.1's loss table are now recognized as commonplace.  Take the following observations from the Honorable Judge Lewis A. Kaplan of the Southern District of New York:

> The second thing I would say is that the loss table . . . is a debatable proposition. Any number of my colleagues have criticized it on various grounds. As I understand its genesis, there's really no empirical basis for the brackets assigned or for the assignment of different losses to different brackets. I share many of those criticisms and concerns with my colleagues. I have never regarded myself, once *Booker* was decided, as in any way bound by guideline computations that depend on the loss table in 2B1.1.  I do not regard myself as bound by it now.

*United States v. Bankman-Fried*, No. 22-cr-00673-LAK, ECF No. 426, Sentencing Tr. at 6:14-25 (S.D.N.Y. March 28, 2024).

An esteemed list of former federal judges and prosecutors have also recently added to the criticism of the loss table.  The practitioners noted that § 2B1.1 "can often call for decades in prison even for first-time offenders whose fraud offense may have been driven by dire personal or professional circumstances and who may have shown great remorse for their wrongdoing and are eager to make amends for harms caused."  *See* Ex. G.  The authors also commented that "these myriad problems with the Guidelines' heavy reliance on loss are further compounded in those cases where calculations of loss end up having little or no relationship to either economic realities or an offender's actual personal gain from an offense."  *Id.*

At a minimum, the Court should take the widespread criticism of § 2B1.1 into account as part of the Guidelines' substantial overstatement of Joe's culpability and economic reality under § 3553(a).  *See also United States v. Johnson*, 2018 WL 1997975, at \*3-4 (E.D.N.Y. Apr. 27, 2018) (describing loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding . . . the lack of any consideration of

18

danger to society"); *Adelson*, 441 F. Supp. 2d at 512 ("the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense.").

## IV.   OTHER MITIGATING FACTORS

### A.   Joe's Acceptance Of Responsibility Was Early And Extraordinary

The prosecutors in this case have never credited Joe's extraordinary acceptance of responsibility. Joe immediately accepted full responsibility for his actions. He initiated plea discussions, waived indictment and agreed to plead guilty to conduct that far exceeded the scope of the allegations in the complaint upon which he was initially arrested. And he has done what he can to try to make things right despite paltry financial resources. He also settled a civil action brought by UBS, avoiding drawn out legal proceedings and a delay in resolution for one of his victims. Joe settled with UBS even though an appellate court in New York found that he had adequately pled a counterclaim concerning the commercial reasonableness of the bank's foreclosure auction at which it was the only bidder. *See Clover Private Credit Opportunities Origination (Levered) II, L.P., et al. v. Joseph Sanberg, et al.*, 227 A.D.3d 540, 540-41 (N.Y. App. Div. 1st Dep't 2024) ("Defendants also persuasively contend that plaintiffs attached unreasonable and oppressive conditions for submitting a bid, thus hindering participation in the auction process."). As to certain investors who invested in Aspiration through entities that he controlled, Joe consented to his removal as the general partner of those entities and waived his economic interest so that investors could maximize any recovery. Joe also "substantially assisted" – voluntarily and with nothing promised in return – an ongoing investigation led by the law firm Wachtell Lipton on behalf of the NBA unrelated to this criminal matter. (Ex. A-12). Even amidst the (now concededly) overstated loss calculations at the time of the plea for the three institutional investors that make up 90% of the loss amount, Joe still agreed to take responsibility under the plea agreement. That is exceptional.

19

DEFENDANT'S SENTENCING MEMORANDUM

**B.      The Government Gave Lenient Treatment To A More Culpable Participant**

Joe Sanberg was *not* the person who submitted fabricated bank and brokerage account statements to UBS to induce the bank to extend the loans at issue.  That person was Ibrahim AlHusseini.  To be clear, Joe had knowledge of the false documents that were presented to UBS, but only AlHusseini knew that he did not have sufficient funds to satisfy the $75 million put option that he promised UBS.

After defaulting on his put option, AlHusseini then racked up a criminal contempt charge (now pending in New York) based on his conduct during a civil litigation brought by UBS.  *Clover Private Credit Opportunities Origination (Levered) II LP v. AlHusseini*, Index No. 653401/2023, NYSCEF Doc. No. 168, Decision and Order (N.Y. Sup. Ct., N.Y. Cnty. Jan. 10, 2025) (granting civil contempt motion and finding that "defendant defeated, impaired, impeded, and prejudiced plaintiff's ability to collect on the judgment and obtain article 52 discovery"); *Id.*, NYSCEF Doc No. 248 (adjourning hearing on criminal contempt motion to June 16, 2026).  AlHusseini also *admitted* to lying in sworn discovery responses in that litigation.  *Id.*, NYSCEF Doc. No. 217 at 21-22 ("There is no excuse for the misstatement Mr. AlHusseini made to [UBS] . . . It is a lie for which Mr. AlHusseini will have to answer when he is sentenced.").  AlHusseini also "sold" his nearly $4 million Venice mansion to his brother shortly before UBS obtained a civil judgment against him.  *Id.*, NYSCEF Doc. No. 99 at 2 n.1.  And AlHusseini spent nearly $1 million on credit cards, political contributions, and luxury trips to Lake Como and Zurich in the months *after* UBS obtained a judgment against him.  *Id.* at 7-9.  Finally, the government closes its eyes to certain victim impact statements that implicate AlHusseini as playing a role in their lost Aspiration investments.  Yet the government has not charged AlHusseini with *any* crimes relating to his interactions with Aspiration investors.  This smacks of unfair targeting of Joe Sanberg.

Even more astoundingly, the government agreed to recommend a four-level downward variance for loss overstating the seriousness of AlHusseini's offense, and it

20

did not require a two-level sophisticated means enhancement in his plea agreement. *United States v. AlHusseini*, No. 25-cr-00042-SVW, ECF No. 26 at ¶ 16. Joe Sanberg was denied these reductions. If the government had offered the same treatment to Joe, his advisory Guidelines range effectively would have been cut in half to 78-97 months. Under § 3553(a), this disproportionately harsh treatment of Joe Sanberg should be taken into consideration.

### C. Joe Is Not Responsible For Aspiration's Bankruptcy Or For Every Investor's Loss

The government's distortions also include an effort to blame Joe for Aspiration's bankruptcy. But neither the plea agreement nor the accompanying Factual Basis even refers to the bankruptcy. This is nothing more than an eleventh-hour, transparent attempt to ratchet up the seriousness of this case by casting all Aspiration investors as Joe's "victims." The Court should reject this preposterous notion.

Joe was never an executive at Aspiration, he held no management authority, and his minority interest was not a controlling stake. He had no responsibility for, or involvement with, much of Aspiration's business and never met many of its investors. Aspiration was not a one-man show. It had a CEO, a board of directors, a chief financial officer, a general counsel and a team of employees. Yet the government blames only Joe Sanberg – without a shred of connective proof – for Aspiration's demise.

Blaming Joe for the bankruptcy also defies common sense. Joe pled guilty to conduct that resulted in money going *into* Aspiration, not taking money out of it. There has been *no finding anywhere in this case* that Joe caused Aspiration's bankruptcy or that he somehow "victimized" all investors. Even investors *who lost money* are clear that "[w]hile Aspiration ultimately had a disappointing outcome as a business venture. . . it was founded with sincere and commendable intentions to serve both economic and social goals." (Ex. A-3).

Moreover, a corporate bankruptcy should not be conflated with fraud or criminality. Tech start-ups like Aspiration frequently experience cash shortages and go

21

bankrupt all the time for reasons *having nothing to do with individual misconduct.* Indeed, Aspiration's bankruptcy followed a massive wave of start-up bankruptcies between 2022 and 2024.  *See* Chris Morris, *Startups Are Booming – but So Are Bankruptcies*, Inc. (Aug. 22, 2024), https://www.inc.com/chris-morris/bankruptcies-vc-backed-startups-rising-data.html.

There are scores of Aspiration investors whom the government, in its sentencing papers, now calls "victims" even though Joe did not solicit them.  For example, the government appears poised to submit a victim impact statement from a 10-year-old boy, who would have been five or six when his mother invested in Aspiration.  While obviously deserving of sympathy, his mother does not claim to have had *any* interactions with Joe either before, during, or after the time she invested in Aspiration.  Other victim impact statements point to interaction with Aspiration's CEO Andrei Cherny and board member (and co-schemer) Ibrahim AlHusseini in relation to their investments, not just Joe.  One investor on the government's victim list writes that he was "solicited directly by Andrei Cherny" in January 2021 (before any of Joe's LOI conduct) and that he "relied on representations made by Mr. Cherny and Aspiration Partners" when he chose to invest.  He only *later learned* that Joe pled guilty.  Yet the government seeks to hold Joe responsible for this investor's $75,000 loss along with the entire rest of the bankruptcy.

Blaming Joe for the company's downfall is a pretext to unfairly label all investors as his "victims."  This is Sanberg-blaming run amok.

### D.      The Government's Characterization Of This Matter As "Ponzi-like" Is False

The government's description of this matter as "Ponzi-like" – which similarly appears *for the first time* in its sentencing brief – is ludicrous.  They center it on the notion that a business development services contract between Joe and Aspiration was illegitimate – without any proof or admission in the plea agreement to that effect.  And, most notably, at the October 20, 2025 hearing in this matter, the government told this

22

Court without equivocation that Joe subsidized the LOIs using his own funds and not funds from the company:

> THE COURT: So Sanberg was the person who gave these carbon offset investors the money. Did the money come from Sanberg personally or from Company A?
>
> MR. STEMPEL: From Sanberg personally, Your Honor.
>
> THE COURT: Oh, I see. And so Sanberg is personally giving money to investors in carbon offsets to purchase carbon offsets from Company A which are then booked as revenue on Company A.
>
> MR. STEMPEL: That's right.

Oct. 20, 2025 Hearing Tr. at 16:13-21.

As discussed above, Aspiration was a real business, offering bona fide services, and engaged in legitimate business activities. It was neither a Ponzi scheme nor "Ponzi-like." This is nothing more than a headline-seeking reputational smear utterly lacking in foundation.

But if the government insists on calling this a Ponzi scheme – which it was not – then respectfully the Court should start its analysis with private equity CEO David Gentile. *See* Press Release, *Former Private Equity Executives Sentenced to Prison* (May 9, 2025), https://www.justice.gov/usao-edny/pr/former-private-equity-executives-sentenced-prison. Gentile went to trial, pressured a witness to lie to the FBI, and was convicted of running of $1.6 billion Ponzi scheme that victimized more than 10,000 investors. His crimes were of a different order of magnitude than two payments of $350,000 each. With an offense level of 43 and a Guidelines range of 1,020 months, Gentile was sentenced to 84 months, a 92% downward variance. *United States v. Gentile*, Case No. 21-cr-00054-RPK, ECF No. 539 at 3, 5; ECF No. 596 (E.D.N.Y. 2025). Applying a 92% downward variance to Joe's offense level would result in a sentence of a year and a day, the same sentence as *United States v. Nadimpalli*, the factually analogous case discussed below in Section VI, *infra*.

DEFENDANT'S SENTENCING MEMORANDUM

**E.      Joe's Mother Needs His Care**

A particularly compelling reason for a profound downward variance is the critical need for Joe to care for his mother, who has "severe limitations." (Ex. A-7). Joe takes care of her "everyday basic needs" and "is absolutely necessary [for her] to navigate everyday life." *Id.* Joe's mom suffers from "severe and worsening ███████████" and her mobility "is becoming terribly limited." *Id.* It is hard for her to walk, even with the use of a cane, and she has to take extra care not to fall. As a result of her increasing challenges, Joe helps her with "preparing meals, cleaning, doing laundry, going to medical appointments and general errands," which are "difficult if not impossible to do" without him. We urge the Court to consider these factors in granting a downward variance under § 3553(a). *See United States v. Marcks*, 2025 WL 1506360, at *1 (D. Nev. May 26, 2025) (court considered defendant's need to care for husband who suffered a stroke nine years earlier as "key mitigation factor at sentencing," resulting in 36-month sentence for defendant who pled guilty to wire fraud conspiracy and aggravated identity theft, a 70% reduction from low end of Guidelines range of 121 to 151 months); *United States v. Munoz-Nava*, 524 F.3d 1137, 1141-43 (10th Cir. 2008) (affirming sentence of one year and a day followed by one-year home confinement for defendant convicted of heroin possession, noting that district court considered that defendant was primary caretaker of 8-year-old son and sole supporter of ailing and elderly parents).

**V.      THE PSR CORRECTLY APPLIES THE ZERO-POINT OFFENDER ADJUSTMENT[4]**

After the government failed to object timely to the draft PSR, *see* Fed. R. Crim. Proc. 32(f), which applied the two-level zero-point offender adjustment, the government now argues in its sentencing papers that Joe is ineligible for the adjustment because he personally caused substantial financial hardship to a victim. In relying on three impact statements, the government only provides the Court with half of the equation. While the statements support that the investors suffered a financial loss – as in any fraud case – the

---

[4] The defense reserves the right to object to the final version of Joe's PSR.

24

government offers no legitimate basis for the Court to conclude that the loss was "substantial" or a "hardship" for those particular individuals.

The substantial financial hardship test is not a check-the-box exercise.  Instead, the Court must evaluate the relative impact of the financial harm on the particular victim in order to assess whether it created a *substantial* hardship.  *Cf. United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020) ("We conclude that section 2B1.1(b)(2) requires the sentencing court to determine whether the victims suffered a loss that was significant in light of their individual financial circumstances.").  "[F]inancial hardship must be substantial in comparison to something else . . . [t]he most natural point of comparison is the financial condition of the victim." *Id.* at 1185.  The "same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup." *Id.* (quoting *United States v. Minhas*, 850 F.3d 873, 877 (7th Cir. 2017)).

First, the government relies on an impact statement from E.K. and M.K.  But their narrative does not establish a substantial hardship as interpreted in *George*.  Rather, they express generalized concerns that "health and other emergencies" could, hypothetically, wipe them out and put retirement out of reach in the future – not that their Aspiration-related loss has in fact already caused such a hardship.  Moreover, it is not clear from the impact statement why they should fairly be considered victims of Joe's conduct.  E.K. and M.K. do not point to a single misrepresentation from Joe that induced their investment, and except for a $5,000 investment in 2024, the remainder of their investments likely would have predated any of Joe's LOI subsidies and the relevant financial statements.

Next, the government points to K.G.'s impact statement, which likewise does not provide the second half of the equation – how the financial loss compares to her current financial condition.  The government misleadingly quotes from K.G.'s statement to assert that she "expects" to return to work after her children are adults.  But, in actuality, K.G. merely states that she "may need to return to work."   The hypothetical possibility of

25

changing employment plans years down the road does not constitute substantial financial hardship.

Finally, Y.B. was invited to invest in Aspiration by her daughter, not Joe, and prior to any subsidized revenue possibly attributable to Joe's conduct being reflected in the company's financials. Y.B. also identifies no misrepresentation from Joe that induced her investment, and provides no basis for the Court to evaluate the relative impact of the loss in the context of her individual financial circumstances.

## VI. JOE DESERVES A GREATER DOWNWARD VARIANCE THAN SIMILARLY SITUATED DEFENDANTS, 18 U.S.C. §§ 3553(A)(1), 3553(A)(6)

The defense expects the government to argue that our recommended sentence would create an unwarranted sentencing disparity. Not so. As the Court well knows, § 3553(a)(1) permits the Court to evaluate the relative culpability of co-defendants in the same case for purposes of calibrating their sentences, and § 3553(a)(6) instructs the Court to promote uniformity nationwide by avoiding disparate sentences for similarly situated defendants. *See United States v. Saeteurn*, 504 F.3d 1175, 1181-82 (9th Cir. 2007). Both prongs support a substantial downward variance.

In addition to its preferential treatment of AlHusseini, *see* Section IV.B *supra*, the government's uncalled-for heavy-handedness in this case is revealed by the treatment of other defendants in high-dollar fraud cases around the country who have engaged in more serious conduct and still received more lenient treatment than the government recommends here for Joe.

Statistics from the U.S. Sentencing Commission confirm that defendants in fraud cases regularly receive substantial downward variances from their advisory Guidelines range. In 2024, roughly the same percentage of defendants sentenced for theft, property destruction, and fraud offenses received a downward variance (38%) as compared to a Guidelines sentence (41%). *See* U.S. Sent'g Comm'n, *Quick Facts: Theft, Property Destruction, and Fraud,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY24.pdf. Of the 38% of

26

DEFENDANT'S SENTENCING MEMORANDUM

defendants who received a downward variance, the average reduction from the advisory Guidelines range was 57%. *Id.* Given these nationwide statistics, a sentence well below Joe's advisory Guidelines range would not create an unwarranted sentencing disparity.

Another district court's recent decision in *United States v. Nadimpalli* is instructive. There, in its sentencing memorandum, the government explained that Nadimpalli "lied about the success of his artificial intelligence startup, SKAEL, to convince venture capital firms, angel investors, and friends and employees to invest over $40 million in his company." *United States v. Nadimpalli*, No. 24-cr-00021-CRB, ECF No. 22 at 1 (N.D. Cal. Oct. 31, 2025). Specifically, Nadimpalli "doctored bank statements and other documents to make it appear that SKAEL had subscriptions adding up to $7 million in annual recurring revenue ("ARR") when, in reality, SKAEL's ARR was less than $200,000." *Id.*

Despite Nadimpalli's Guidelines range of 63 to 78 months, the government recommended only 18 months on account of his "clear and early acceptance of responsibility." *Id.* The government explained that such a sentence would be a "just punishment" that would reflect the seriousness of Nadimpalli's conduct, provide adequate deterrence, and avoid unwanted sentencing disparities. *Id.* The court sentenced Nadimpalli to a year and a day, an 81% reduction from the low end of his Guidelines range. *Id.*, ECF No. 27 (N.D. Cal. Nov. 17, 2025).

There are three notable differences between *Nadimpalli* and this case – all of which weigh in Joe's favor. While Nadimpalli agreed to pay back more than $500,000 he stole from his company, Joe did not steal from Aspiration. *Id.*, ECF No. 22 at 1. And while Nadimpalli agreed to sell his house to pay back investors, *see id.*, Joe does not have a house or any assets to give to investors because he lost virtually everything to UBS's foreclosure sale and Aspiration's bankruptcy (and consented to forfeiture of all funds in his bank accounts). According to the government, Nadimpalli also submitted doctored bank statements to obstruct his company's investigation into his conduct. *Id.* at 7. Joe did nothing of the sort. The defense respectfully submits that the Court should follow the

27

court's approach in *Nadimpalli*.  *See also United States v. Heine*, 2018 WL 2986212, at *10 (D. Or. June 14, 2018) (78% variance and 24-month sentence for defendant with Guidelines range of 108 to 135 months after bank fraud conviction at trial, explaining that defendant's crimes substantially jeopardized the soundness of a financial institution but did not directly line his pockets and were primarily intended to hide his employer's financial problems, defendant was "virtually broke" and character letters described "his many charitable and selfless activities over many years."), *convictions vacated by United States v. Yates*, 16 F.4th 256 (9th Cir. 2021); *United States v. Matthews*, Case No. 18-cr-00048-VAB, ECF No. 221 (Govt. Sentencing Memo) and ECF No. 230 (Sentencing Tr.) (D. Conn. 2023) (57% variance and 65-month sentence for defendant who pled guilty to fraud, money laundering, and tax evasion schemes spanning more than a decade, including theft of millions of dollars from vulnerable EB-5 investors which was used to purchase a $5.3 million home, a yacht, and several luxury vehicles, with offense level of 34 and advisory range of 151 to 188 months); *United States v. Cole*, Case No. 19-cr-00869-ER, ECF No. 312 at 8-9 (S.D.N.Y. 2022) (18-month sentence, 77% downward variance for public company CEO convicted of what the government described as "a calculated, long-running and sophisticated accounting fraud scheme" based on round trip transactions, inflated prices, secret side deals and the CEO's sale of $40 million worth of stock during the scheme).

The Court should also consider the government's forgiving treatment of Andy Wiederhorn, the CEO of Fat Brands.  He was charged here in the Central District of California with a decade-long "sham" loan scheme covering up $47 million in illegal payments he received from his company.  *United States v. Wiederhorn*, No. 24-cr-00295-RGK, ECF No. 1 (C.D. Cal. May 9, 2024).  Yet the U.S. Attorney's Office chose to *dismiss its fraud charges* against Wiederhorn.  *Id.*, ECF No. 132.  How is it that the government sees only red when it comes to Joe Sanberg, but dismissed its case against Wiederhorn?  Joe Sanberg, a first-time, non-violent offender who never stole from his

DEFENDANT'S SENTENCING MEMORANDUM

company, immediately took responsibility for his crimes, and is already making amends, is certainly worthy of similar consideration.

## VII.   INCARCERATION IS UNNECESSARY TO ACHIEVE SPECIFIC OR GENERAL DETERRENCE, 18 U.S.C. § 3553(A)(2)(B)

The government often justifies severe prison sentences in white collar cases under the guise of specific and general deterrence.  There is zero indication that Joe is a threat to re-offend and no rational businessperson would ever look at Joe's current circumstances and conclude that the risk is worth the reward.  Courts frequently take the collateral consequences of a conviction into account in assessing deterrence and fashioning a just and proportionate sentence.[5]  The consequences for Joe have already been severe, public, and deeply personal.  He has no assets to his name, he is living on his mother's couch, he has been publicly mocked, and he is facing a deluge of civil lawsuits against which he is unable to defend himself because he cannot afford to engage counsel. It will take Joe many years to rebuild his life, which will never be the same.  There is simply no need for a heavy-handed approach to serve the goal of specific deterrence.

There is also no realistic possibility that Joe will re-offend given what he has already dealt with and what he will continue to deal with in the years to come.  The government's sensationalized, hyperbolic press release will live on the internet forever. The idea that Joe would risk going through all of that again on the off chance that "crime might pay" is absurd.  Joe has been compliant with his bail conditions, and he has been a productive member of society at the same time, caring for his mother and tutoring students from immigrant communities for whom English is a second language.  Joe's post-offense conduct strongly suggests that incarceration is not necessary to deter him,

---

[5] *See, e.g., United States v. Sponaugle*, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and reputational impact); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company").

29

DEFENDANT'S SENTENCING MEMORANDUM

and published research from the Sentencing Commission confirms that white-collar offenders with a college degree, like Joe, pose the *lowest* risk of recidivism in the federal system. *See* U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016) at 24, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

Nor does general deterrence justify a lengthy sentence. Judges across the country acknowledge that sentences well below the advisory Guidelines range can deter the public in white collar cases. *See, e.g., Johnson*, 2018 WL 1997975, at *5 ("[A]ny amount of prison time is a serious amount of prison time[]" and therefore even a lenient sentence, "combined with the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient . . . to effect general deterrence."); *Musgrave*, 647 F. App'x at 534 (sentence of supervised release combined with home confinement and severe financial penalty afforded adequate general deterrence for bank fraud and wire fraud conviction). Even the government came to this conclusion in *Nadimpalli*. No. 24-cr-00021-CRB, ECF No. 22 at 1.

Research published by the National Institute of Justice ("NIJ") – the research, development, and evaluation agency of the Department of Justice – reached the same conclusion, finding that "increasing the severity of punishment does little to deter crime." Nat'l Inst. Justice, *Five Things About Deterrence*, June 5, 2016, https://nij.ojp.gov/topics/articles/five-things-about-deterrence. NIJ's research underscores that it is the *certainty* of being caught that deters a person from committing crime, not the severity of the punishment. In addition, the crime prevention benefit of long sentences falls far short of the social and economic costs of extended incarceration. Simply put, deterrence has been accomplished here.

## CONCLUSION

John S. Martin, a distinguished former District Judge in the Southern District of New York, recently addressed "the overly long sentences that are being imposed every day in our federal courts on nonviolent offenders." John S. Martin, *Cruel But Not*

30

*Unusual: The Sentence Recommended for Sam Bankman-Fried*, New York Law Journal (March 12, 2024), https://www.law.com/newyorklawjournal/2024/03/12/cruel-but-not-unusual-the-sentence-recommended-for-sam-bankman-fried/.  He wrote that "[w]e have lost all sense of how horrible it is to spend even one year in prison, far away from family and friends . . ."  *Id.*  Judge Martin is right.

Joe Sanberg's remarkable anti-poverty work, his lack of greed and the absence of any intent to harm should earn him a great measure of mercy at sentencing.  "Mercy is seldom included on the list of 'traditional' rationales for sentencing.  It is, however, evinced by the federal sentencing statute, 18 U.S.C. § 3553(a), which provides . . . that the lowest possible penalty consistent with the goals of sentencing be imposed."  *United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998) (citing *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom")).  The government's repeated overstatements of Joe's culpability should also earn him some respite.

Joe "is not a perfect man, but he is one who strives always to be the best version of himself—one who looks out for the little guy because he knows what it is like to be one . . ." (Ex. A-2).  He possesses "[t]raits [that] are indicative of a person who is capable of growth, integrity, and positive contribution to society." (Ex. A-6).  Those who know Joe best describe him as "a person who believes deeply in justice and personal responsibility."  They are "confident he will do everything in his power to make things right." (Ex. A-8).

31

DEFENDANT'S SENTENCING MEMORANDUM

Dated: April 19, 2026                           Respectfully submitted,


                                                 /s/ Marc L. Mukasey
                                                MARC L. MUKASEY
                                                TORREY K. YOUNG
                                                Seyfarth Shaw LLP
                                                620 8th Avenue, 32nd Floor
                                                New York, NY 10018

                                                and

                                                 /s/ Brian R. Michael
                                                BRIAN R. MICHAEL
                                                Morrison Foerster LLP
                                                707 Wilshire Boulevard, Suite 6000
                                                Los Angeles, CA 90017

                                                Attorneys for Defendant
                                                JOSEPH NEAL SANBERG

32